UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 24 CR 190 |
| v. | ) | |
| | ) | Judge Coleman |
| RICHARD BRENDAN GLOBENSKY | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant, once a trusted employee at Augusta National Golf Course, took advantage of his position as a warehouse manager to steal large quantities of ANGC merchandise and memorabilia which he sold for millions of dollars. To adequately protect the public, impose just punishment for commission of such a serious offense, and deter the defendant and others from committing similar crimes, the Court should impose a sentence of 16 months' incarceration.

**I.     The offense of conviction**[1]

Beginning no later than 2009 and continuing until in or around August 2022, at Augusta, in the Northern District of Georgia, and elsewhere, defendant caused to be transported and transferred in interstate commerce goods, wares, and merchandise of the value of $5,000 or more, knowing the same had been stolen, converted and taken by fraud, in violation of Title 18, United States Code, Section 2314.

---

[1] The government has no factual objections to the PSR and agrees with its calculation of the advisory USSG range.

*Background*

Specifically, Augusta National Golf Club ("ANGC") was a private golf club located in Augusta, Georgia. Since 1934, ANGC hosted the Masters Tournament. ANGC annually purchased large quantities of Masters Tournament merchandise from various wholesale vendors, which ANGC sold at retail to members of the public during the week of the Masters Tournament. ANGC had exclusive rights to sell Masters Tournament merchandise to the public, and generally did not make Masters Tournament merchandise available for sale outside of the Masters Tournament week. ANGC stored large quantities of Masters Tournament merchandise in a warehouse on ANGC grounds.

In or around 2007, ANGC hired defendant as a Warehouse Assistant. In that role, defendant was responsible for, among other things, overseeing the receipt and storage of Masters Tournament merchandise at ANGC, and maintaining records used to conduct the post-Masters Tournament merchandise audits.

*The Theft and Sale of Masters Tournament Merchandise*

Beginning no later than 2009 and continuing until approximately 2022, defendant regularly stole large quantities of Masters Tournament merchandise—including t-shirts, jackets, hats, flags, chairs, watches, mugs, and other items—from the ANGC warehouse. Defendant sold the stolen Masters Tournament merchandise to Individual A, who owned and operated two online businesses based in Florida that specialized in selling and auctioning Masters Tournament merchandise and memorabilia. Individual A regularly sent defendant requests for specific types of

2

Masters Tournament merchandise that Individual A sought to sell to Business 1 customers. Defendant surreptitiously photographed the items he could steal from the ANGC warehouse and sent the photographs to Individual A. Defendant and Individual A then negotiated a sales price and, once an agreement was reached, coordinated on the delivery of the stolen items to Individual A.

Defendant stole the merchandise from the ANGC warehouse by loading it into a truck and transporting the merchandise to an offsite storage facility that he maintained in Augusta. Defendant stole a portion of these goods after the Masters Tournament had already occurred. Defendant and Individual A then arranged for Individual A to travel from Florida to Augusta, Georgia, to receive the stolen merchandise at defendant's storage facility and transport it back to Florida, or Defendant shipped the stolen merchandise to Individual A in Florida using commercial carriers such as UPS. Individual A then arranged for Business 1 to issue payment to defendant for the stolen merchandise. Business 1 resold the stolen merchandise online, often at significant markups from what Individual A had paid defendant.

Defendant took steps to conceal his involvement in the theft and sale of the Masters Tournament merchandise. For example, defendant stole goods in quantities that he knew fell below ANGC's auditing risk thresholds. Defendant also directed Individual A to have Business 1 issue the majority of payments to defendant in the name of defendant's wife. Later, when informed by Individual A that Business 1 intended to begin issuing 1099s for such payments, defendant set up an LLC that

was used only for receiving payments for items that defendant stole from ANGC. When defendant shipped stolen merchandise to Individual A, defendant, at Individual A's direction, often shipped the items addressed to a third-party stand-in business in order to disguise that Business 1 was the intended recipient of the packages. Further, Individual A and defendant regularly discussed how Business 1 should only sell specific types of Masters Tournament merchandise that: (1) had been (or would be) legitimately sold by ANGC at retail during the Masters Tournament week; or (2) was undated, and therefore could not be traced to a specific Masters Tournament.

During the offense, in total, defendant was paid approximately $5,305,911 by Business 1 for Masters Tournament merchandise that he stole from ANGC.

*The Theft and Sale of Masters Tournament Historical Memorabilia*

In addition to annually selling Masters Tournament merchandise to the public, ANGC preserved and stored various types of historical Masters Tournament memorabilia on its grounds, including many of the signature green sports jackets annually awarded to the Masters Tournament champion, trophies, programs, tickets, letters, and other items.

In or around 2009, defendant began stealing from ANGC various Masters Tournament historical memorabilia items, which defendant was able to access through his employment at ANGC. Defendant agreed with Individual A and others, including Individual B, an associate of Individual A, to sell and/or auction the stolen memorabilia in interstate commerce. Between 2009 and 2022, defendant stole

4

multiple items of historical memorabilia from ANGC and sold them in interstate commerce. Between approximately 2009 and 2022, defendant was paid approximately $297,387 for the historical memorabilia that he stole from ANGC. Many of these items were later resold at significantly marked up prices.

As a result of his theft of Masters Tournament merchandise and historical memorabilia, defendant is responsible for approximately $3,448,842 in actual loss to ANGC.

## II. Imposition of sentence

To adequately protect the public, impose just punishment for commission of such a serious offense, and deter the defendant and others from committing similar crimes, the Court should impose a sentence of incarceration. Defendant did provide cooperation to the government and presents other facts in mitigation. As a result, the government anticipates it will make a 5K motion at the hearing and recommend the Court impose a sentence of 16 months' imprisonment.

### A. Custody

The defendant's involvement in the offense was not fleeting or the result of a momentary lapse in judgment. Defendant stole merchandise and memorabilia from his employer for many years, in part by (i) stealing merchandise that was otherwise slated for destruction and (ii) using his knowledge of auditing risk thresholds to avoid detection. During the years he was employed at ANGC, as the public's interest in its merchandise grew, the quantities defendant was able to steal from his employer

increased. By the time he separated from employment at ANGC, defendant had been paid approximately $5,305,911 for stolen merchandise.

The funds defendant obtained enabled he and his spouse to live a lifestyle far beyond their means,[2] and the manner in which he spent the crimes proceeds suggests greed was defendant's primary motivation for committing the offense. For example, during the last approximately six years of the crime, defendant spent more than $370,000[3] to purchase 5 different vehicles and a motorboat,[4] as well as more than $160,000 for Disney-themed vacations and related activities. During this time-period, defendant paid nearly $600,000 to several businesses for construction of a custom-built home and paid approximately $175,000 in 2017 to buy the vacant lot next to his residence. Shopping at Louis Vuitton between 2016 and 2022 totaled approximately $32,000. The Court's sentence must recognize the seriousness of the offense and impose punishment that will deter defendant and others from engaging in such profligate thievery.

Nonetheless, there are factors in mitigation which suggest that imposition of a sentence below that recommended by the USSG will be sufficient, but not greater than necessary, to meet the goals of Section 3553. First, once represented, defendant admitted his involvement in the crime and agreed to cooperate with the government in related investigations. While doing so, defendant undertook actions at the

---

[2] While employed at ANGC during this time, defendant's hourly wage was $17 to $19 per hour.
[3] The $300,000 figure excludes the value of vehicles traded-in at the time of purchase.
[4] The vehicles purchased included two different Mercedes, a 2019 Range Rover, and a 2019 Cadillac Escalade ESV.

6

government's direction. Although no third-parties have been charged, defendant's proactive efforts in this regard should be recognized. As a result, the government anticipates it will make a 5K motion in defendant's favor. Additionally, defendant's prior lack of involvement in criminal activity and the unique circumstance in which the crime evolved, along with his cooperation, suggests that specific deterrence is a lesser concern. Finally, defendant's agreement to make a pre-judgment restitution payment of more than $1.5M from the proceed of the sale of his former residence is also mitigating factor.[5]

In light of the mitigating factors described above, the government anticipates it will make a 5K motion and recommend a 16-month sentence of imprisonment, which is 1/3 lower than the low-end recommended by the USSG. A 16-month sentence will send an adequate message of deterrence, promote respect for the law, and impose just punishment for such a serious offense. In doing so, however, it will also recognize the value of defendant's decision to proactively cooperate with the government.

B.   **Financial**

Defendant should be ordered to pay restitution in the amount of $3,448,842 to ANGC. In addition, defendant agreed to the entry of a forfeiture money judgment in the amount of $5,305,911, the sum he received over time for the stolen ANGC merchandise and memorabilia. The judgment should reflect that the government has agreed to credit restitution payments against the balance on the forfeiture money judgment, and that a restitution payment has been made to the Court in advance of

---

[5] The weight accorded to this mitigating factor should recognize, however, that the residence was largely paid for with proceeds of the offense.

judgment in the amount of $1,571,767.70. Thus, a forfeiture money judgment should be entered in the amount of $3,734,143.30.

### C. Terms of supervision

The government has no objection to the recommendation of probation that defendant be placed on supervised release for 1 year after he serves his sentence, under terms recommended by probation in the PSR, which appear necessary to monitor the defendant's compliance with the Court's orders, to enhance probation officer and defendant safety, to support defendant's reintegration into the community, to reduce recidivism, to promote responsible fiscal behavior and payment of restitution, and to protect the public.

### III. Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 16 months' imprisonment, 1 year of supervised release, restitution in the amount of $3,448,842, and enter a forfeiture money judgment in the amount of $3,734,143.30.

Respectfully Submitted,

MORRIS PASQUAL
Acting United States Attorney

By: /s/ *Brian Hayes*
BRIAN HAYES
Assistant United States Attorney
Brian.Hayes@usdoj.gov

Dated: March 5, 2025